UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | | |
|---|---|---|
| Jonathan C. Davis, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. **CV 322-145** |
| | ) | COMPLAINT |
| Telfair County, through its Commission | ) | DAMGES |
| Chair Edwin Neal, in his official capacity, | ) | JURY TRIAL |
| | ) | INJUNCTIVE RELIEF |
| Telfair County Commissioners, | ) | |
| individually and in official capacities, | ) | |
| Edwin Neal, Annie Williams, Jason Boone | ) | |
| Jason White and Dakkia Bradshaw, | ) | |
| | ) | |
| Former Sheriff Chris Steverson, individually | ) | |
| and in his official capacity, | ) | |
| | ) | |
| The following deputies in their individual | ) | |
| and official capacities: Chief Billy Johnson, | ) | |
| Capt. Kyle Carver, Lt. Terry Moon, | ) | |
| Staff Sgt. Fussell, Sqt. Alisa Zanders, | ) | |
| FNU Clemmons, FNU Toler, | ) | |
| Ron Bowdoin and FNU and LNU Black | ) | |
| woman, in tower when | ) | |
| Plaintiff assaulted 10.21.2022 | ) | |
| | ) | |
| Officers whose first names are unknown, | ) | |
| sued individually and in their official | ) | |
| capacity: Clements, Toby, McRae, | ) | |
| Roundtree, Eubanks, Powell, Carter | ) | |
| Hulett, Johnson, Ocasio (deceased) | ) | |
| McLoon, Battle and Floyd, | ) | |
| | ) | |
| Unknown officers, John and | ) | |
| Mary Doe 1-20, individually and | ) | |
| in his/her official capacity, | ) | |
| | ) | |
| Sheriff Sim Davidson, individually | ) | |
| and in his official capacity | ) | |
| beginning January 2021, | ) | |
| | ) | |
| Hospital Authority of Dodge County, | ) | |

1

```
d/b/a Dodge County Hospital,                    )
                                                )
The Southland Medical Group, LLC,               )
d/b/a Southland Medical,                         )
                                                )
Dingane Baruti, MD,                             )
                                                )
All individually and jointly,                   )
                                                )
            Defendants.                          )
_____)
```

## COMPLAINT

COMES NOW, Plaintiff, who shows the Court the following:

### Jurisdiction and Venue

1.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action asserts one or more deprivations of federal constitutional rights under color of law, which is actionable under 42 U.S.C. §§ 1983 and 1985(3), to provide remedial relief of damages for injury caused by the deprivation of federal rights, and for prospective injunctive relief to prevent future deprivations.

2.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims under Georgia law because the facts supporting the state claims arise from the same or similar facts supporting and form at least part of the same case or controversy under Article III.

3.      Venue is proper within the Dublin Division because the challenged incident occurred in Telfair Columbia County, and one or more of the defendants resides within Telfair County, which is in the Dublin Division.

Parties

Plaintiff

4.     Jonathan C. Davis is 39 years old, competent to bring this action and is a person protected by the Constitution of the United States, federal and state law.

Defendants

5.     Telfair County, through its Commissioners, and its Chair, Edwin Neal, in his official capacity.

6.     Telfair County Commissioners, individually and in their official capacities: Edwin Neal, Annie Williams, Jason Boone, Jason White, and Dakkia Bradshaw.

7.     The County has a duty under Georgia Law to provide medical care and not to inhumanely treat any person under arrest, and a duty under federal law and not to provide medical care that is deliberately indifferent to serious medical needs.

8.     The County and the individual's Commissioners are sued for failure of the duty to provide medical care it is not inhumane by providing funding for the same, because the individual Commissioners know the Sheriff has no authority to raise funds and yet has the duty to provide detainees and inmates with medical care that is not deliberately indifferent to serious medical needs.

9.     The County and individual commissioners are sued for being a causative factor in the creation of a system that provided no prescription medications except in rare circumstances and

that failed to provide medical care except for that which was deliberately indifferent and fraught with undue delay and needless suffering.

10.    The County is also sued for not providing and paying for the medical care of plaintiff that occurred after he was released from duty where the causation and need for the medical care occurred while he was in custody with the County.

11.    Former Sheriff Chris Steverson, individually and in his official capacity.

12.    The Sheriff is sued for the failure to provide a timely bail and bond hearing, the operation of the jail that was devoid of security policies and regulations the cause the challenged assault on October 21, 2020 and for a total lack of the provision of prescription medications and timely and appropriate medical care amounting to a policy and practice of indifferent medical care.

13.    The following Telfair deputies in their individual and official capacities: Chief Billy Johnson, individually and in his official capacity as the commander of the jail; Capt. Kyle Carver, individually and in his official capacity as the commander of the jail; Lt. Terry Moon, individually and in his official capacity as the commander of the jail; Staff Sgt. Fussell, individually and in his official capacity as a supervisor at the jail; Sqt. Alisa Zanders, individually and in his official capacity as a supervisor at the jail.

14.    Defendants Capt. Kyle Carver, Lt. Terry Moon, Staff Sgt. Fussell,  and Sqt. Alisa Zanders are sued in connection with the assault of October 21, 2020, for not appropriately implementing security at the jail in preventing inmate for, who assaulted an inmate prior to assault plaintiff where footman had been acting erratic all day and been acting aggressively toward officers since his arrival, where it was apparent that footman should have been isolated from other inmates at least as of the time that he assaulted Lockett before assaulting Plaintiff.

15.    Defendants Capt. Kyle Carver, Lt. Terry Moon, Staff Sgt. Fussell,  and Sqt. Alisa Zanders are sued for not ensuring that officers on duty at the time of the assault between one or more detainees are inmates would timely engage to prevent further assault, where at least officers Clemmons and Toler had an opportunity to intervene in the assault of plaintiff by inmate Footman but did not do so.

16.    FNU Clemmons, individually and in his official capacity as a jailer and FNU Toler, individually and in his official capacity as a jailer, and the officer who was in the tower, a Black woman whose first name last name are not known.

17.    FNU Clemmons, FNU Toler, the unknown Black woman officer in the tower are sued because they observed inmate Footman assaulting Plaintiff on October 21, 2020 and had an opportunity to intervene but failed and refused to do so, denying Plaintiff equal protection of the law.

18.    Ron Bowdoin, is sued individually and in his official capacity for signing the arrest warrant for Plaintiff and not providing required bail or probable cause hearings in a timely fashion as required by law, where plaintiff had been provided such hearings, he would have been able to get bail in be out of the jail before the assault on October 21, 2020.

19.    Other officers whose first names are unknown are sued because potentially they were working the day of the assault and were aware of the fact that Footman had always acted aggressively towards officers, that Footman had assaulted inmate or detainee Lockett before he assaulted Plaintiff and Footman should have been isolated from others, and they are also sued for the possibility that they observed the assault, had an opportunity to intervene but failed and refused to do so, and those defendants sued individually and in their official capacity: Clements,

Toby, Mcrae, Roundtree, Eubanks, Powell, Carter, Hulett, Johnson, Ocasio deceased, McLoon, Battle Floyd.

20.     There are other unknown officers, identified in the complaint as "Unknown officers, John and Mary Doe 1-20," who are sued because potentially they were working the day of the assault and were aware of the fact that Footman had always acted aggressively towards officers, that Footman had assaulted inmate or detainee Lockett before he assaulted Plaintiff and Footman should have been isolated from others, and they are also sued for the possibility that they observed the assault, had an opportunity to intervene but failed and refused to do so.

21.     Sheriff Simeon Davidson, individually and in his official capacity.

22.     Sheriff Davidson is sued for not getting Plaintiff the prescribed medication for the two months of Davidson's for perpetuating the prior policies inadequate medication and in a adequate medical care.

23.     Sheriff Davidson is also sued for not providing for the medical care of the plaintiff after he was released where the causation and need for the care occurred while he was in custody of the Sheriff and the release was accomplished to avoid providing the required medical care.

24.     Hospital Authority of Dodge County, as an authority has the capacity to sue and be sued under Georgia law, d/b/a Dodge County Hospital, 901 Griffin Ave, Eastman, GA 31023 is sued and served through Paul Jones, Chair, Board of Directors or its managing CEO J. LaDon Toole.

25.     The Dodge County Hospital is CMS certified, accepts Medicare, operates an Emergency Department at which Plaintiff was examined by Dr. Baruti, and is otherwise covered by the Emergency Medical Treatment and Labor Act (42 U.S.C. §1395dd) ("EMTALA").

26.     Under EMTALA Defendant Dodge County hospital was required to provide an appropriate screening, to stabilize Plaintiff before his release or discharge and/or promptly

6

transfer plaintiff to a hospital with the capacity and willingness to accept Plaintiff, and to perform the appropriate documentation and certification of the conditions allowing and requiring the transfer under EMTALA, from Defendant Dodge County Hospital to a hospital like North Side in Atlanta, where there was a specialist to provide appropriate treatment for Plaintiff, however their agent Dr. Baruti, failed to provide an appropriate screening, did not stabilize and did not transfer Plaintiff consistent with EMTALA.

27.     The Southland Medical Group, LLC, d/b/a Southland Medical, served through its managers located in Georgia, Lee, M Allen, MD, P.O. BOX 1276, Thomasville, Ga 31799 and Williams, Jonathan S, DO, P.O. BOX 1276, Thomasville, Ga 31799 Williams, Jonathan, or the local manager of Southland Medical, 100 South Madison St, Thomasville Ga. 31792, Phone 229-236-0831.  The Secretary of State's website lists Wade H. Coleman, 109 South Ashley Street, Valdosta, GA, 31601 as the Registered Agent for Service.

28.     Upon information and belief Defendant Southland entered into a contract to provide to Defendant Dodge County Hospital personnel qualified emergency medical care to comply with EMTALA, and because Dr. Baruti acted in failed to act in a manner that was inconsistent with EMTALA and indicated he was not qualified emergency medical care, Southland's agent breached the contract they had with defendant Dodge County Hospital where the intended or third-party beneficiary was the plaintiff and any other patient who was seen or treated in the emergency department covered by the contract between Defendant Southland and Defendant Dodge Hospital of which Plaintiff was one of the contractually intended beneficiaries.

29.     Dr. Dingane Baruti, the emergency room physician for Defendant Dodge County Hospital under EMTALA and employee or agent of Defendant Southland was required screen inappropriately stabilize and/or transfer Plaintiff under EMTALA.

30.     Dr. Baruti observed and smelled the strong odor from Plaintiff's inflamed and infected wound on the penis and saw the plastic of the implant, but did not provide the slightest bit of care, and failed to provide an appropriate screening, did not stabilize and did not transfer Plaintiff as required by EMTALA, given that Baruti was not a urologist and the Hospital did not have the personnel or facilities to treat Plaintiff, but Baruti knew that Plaintiff's treating Urologist did, because Plaintiff told Baruti about Dr. Hakky in Atlanta, at Northside Hospital.

Facts

31.     Mr. Davis was a pretrial detainee in the Telfair County jail, under the control of the County Defendants, from September 18, 2020 until about March 4, 2021.

32.     On both the first and second day at the jail Plaintiff was told that no prescription medications would be provided.

33.     Plaintiff told the jailer he needed medication for COPD, for breathing, for anemia, anxiety and severe anxiety, but the jailer had no medical intake forms and took no notes and repeated that there would be no medications provided.

34.     Plaintiff suggested that he could have his mother provide the medications.

35.     Plaintiff's mother, retired nurse, brought Plaintiff's medications to the jail but they refused to take them, and refused to give them to him.

36.    Plaintiff's medications the related condition and how long he has been taken them are as follows;

\

| | | |
|---|---|---|
| Breo Inhaler | COPD | 6 years |
| Albuterol Inhaler | COPD | 8 years |
| Omeprazole | bleeding peptic ulcer and gird | 4 years |
| Dexilant | bleeding peptic ulcer and gird | 4 years |
| Duloxetine | depression, anxiety | 6 years |
| Xanax | severe anxiety | 20 years |
| xyzal | allergies and breathing | 4 years |
| hydrocodone as needed | pain  (rod in leg) | 10 years |
| Ferrous sulf (Iron) | anemia | On and off 10 years. The bleeding ulcer made him more anemic than usual |
| Testosterone shots, | low test caused by anemia | on and off 10 years |
| B-12 shots or tablets | anemia | |
| Albuterol Sulfate | breathing treatments | 8 years |

37.    From day one plaintiff was vomiting blood in it was seen by virtually all of the jailers during the period of time that plaintiff was jailed.

38.    Vomiting blood was from a peptic ulcer, for which an endoscopy was scheduled in late September but that days came and went and nothing was ever done to arrange any diagnosis or treatment of the peptic ulcer, let alone provide the medication for the peptic ulcer.

39.    Plaintiff would vomit 2 or 3 times a day and have to clean it up himself and asked the guards for the equipment.

40.    Dr. Todd Peacock, had scheduled Plaintiff for an endoscopy on September 24 which was never provided to address the bleeding and the anemia.

41.    Dr. Todd Peacock regularly called the jail, almost weekly to supervising officers like Chief Billy Johnson, Capt. Kyle Carver, Lt. Terry Moon, Staff Sgt. Fussell, Sqt. Alisa Zanders to tell them how dangerous Plaintiff's condition was and that he needed his prescribed medication,

but because of the policy of the defendant county and the defendant Sheriff no prescription medication was provided.

42.     In late September 2020, after Plaintiff had a seizure because none of his prescribed medications were provided because of the challenged policy not to provide required prescription medication, after the seizure plaintiff had been placed in a chair and officers were pushing him through a door and his leg with the rod is attached to the 5th and his knee hit the door and popped.

43.     Because of the other medical problems and infection plaintiff still has not had his leg repaired.

44.     On about October 19, inmate Footman assaulted someone at lunch, and that he was allowed to walk around unrestrained even though he had always been very aggressive and threatening toward the jailers since he arrived in early September.

45.     Plaintiff noticed that the jailers seemed to be afraid of Footman.

46.     Footman was very aggressive and threatening toward the officers.

47.     About an hour before Footman assaulted Plaintiff, on October 21 Footman was up close and in Plaintiff's face, and this was observed by officers Clemens and Toler and the Black woman regarding the tower, and possibly some of the other unknown guards.

48.     Plaintiff heard some commotion upstairs before he was assaulted and based on information from detainees who had been upstairs footman had assaulted locket upstairs before he came downstairs to assault Plaintiff.

49.     Footman had started a petition about an objection to the food and footman thought that inmate or detainee Lockette and Plaintiff had done something with the paper or the petition.

50.     Footman was allowed to walk back and forth, anywhere around in the jail.

51.    Footman came into the cell, and Plaintiff was lying on the first level bulk reading.

52.    Footman immediately started kicking and hitting him and Plaintiff tried to get out but when he would swing his legs out and tried to sit up, Plaintiff would bump his head and Footman would kick or hit him.

53.    The bunks were metal and the edge of the bunk was raised to hold in the mattress in, and as plaintiff was sitting on the edge of the bunk with his legs spread to stand up, Footman either kicked or hit him right in the crotch, hitting Plaintiff's penis causing the implant to protrude from the left side of his penis.

54.    Plaintiff's penis split open and caused it to bleed and expose the plastic implant.

55.    The beating lasted for 7 to 10 minutes and officers Clemens, Toler and the Black woman from the tower saw the beating, as did other unknown guards, and had an opportunity to intervene but they did not.

56.    That same day, one or more of the guards had seen Footman assault Javon Lockett, but they done absolutely nothing to arrest or restraint Footman before he assaulted Plaintiff.

57.    The next night, October 22, deputies from the Sheriff's  Department came to extract Footman from his cell.

58.    The regular jailers were not involved, because apparently there afraid of doing the extraction.

59.    The guards put Footman in A pod and the inmates were promoted and allowed to beat him.

60.    Footman was not prosecuted for the assault on plaintiff or Lockette and was shipped out shortly thereafter, which supports the conclusion that the jail was out of control, and that supervisors including Defendant Sheriff, along with Chief Billy Johnson, Capt. Kyle Carver, Lt.

Terry Moon, Staff Sgt. Fussell and Sqt. Alisa Zanders, were operating a jail under reign of terror, and not lawful control of persons perceived to be a an imminent threat of others.

61.    Plaintiff started having trouble with the bleeding from the injury immediately after the injury.

62.    That night, after the assault, Plaintiff talked to his mother on the phone and told her about the assault, that it went on unstopped, the injuries and the lack of medical care, because the jail staff would not appropriately respond to requests for medical care.

63.    The next day Plaintiff had difficulty urinating, which was a problem the entire time Plaintiff was incarcerated.

64.    When Plaintiff sought medical care, jailers told his mother he refused medical care which wasn't true and did nothing,_

65.    Clemmons, Toler and others thought it was funny and laughed.

66.    Plaintiff warned the jailers about infection, every day, but all Plaintiff was given was hydrogen peroxide for self treatment.

67.    Plaintiff's mother, _Donna Sapp, and Dr. Todd Peacock, Plaintiff's treating physician, _ called the jail 2 or 3 times a week about the refusal to provide appropriate medical care for Plaintiff's injuries.

68.    Within three or four days there was a discharge coming from the wound and is smelled horrible.

69.    If one was four of five feet of wound it was stomach turning.

70.    Plaintiff complained day and night about the open wound, possible infection and excruciating pain, to: Defendant Sheriff, along with Chief Billy Johnson, Capt. Kyle Carver, Lt. Terry Moon, Staff Sgt. Fussell and Sqt. Alisa Zanders,Clemmons, Toler, and possibly, Clements,

Toby, Mcrae, Roundtree, Eubanks, Powell, Carter, Hulett, Johnson, Ocasio (deceased) McLoon Battle, Floyd.

71.    Plaintiff complained to every Officer who worked at that jail hoping at least one would do something.

72.    No one took any action.

73.    Plaintiff also tried to get Capt. Carver and others to actually look at the injury, and they all said they didn't want to see it.

74.    On about November 15, Officer Battle took a quick look, and couldn't believe how swollen and discolored the area of the open injury was.

75.    Battle's statements indicated that he knew the injury was serious and that it was substantially likely that the healing process was not working without infection, and he was aware that the condition was serious, just from his own life experience about cuts he and other friends and family and had an possible infection,  or alternatively he knew from training.

76.    After Plaintiff told his mother about the open wounds, the injuries, and the lack of any medical care, she contacted Plaintiff's physician, Dr. Todd Peacock a local general practitioner, and she asked him to contact the jail and try to get medical care for Plaintiff.

77.    Plaintiff's mother also contacted Plaintiff's Urologist, Dr. Tariq Hakky in Atlanta, about the injuries, the ongoing failure to heal and the substantial likelihood of infection, that could cause serious and permanent injury and even death.

78.     After about a week Plaintiff told his mother that the open area was infected and she called Dr. Peacock and Dr. Hakky and informed them that the area was infected. and Dr. Hakky called and told jailers to bring Plaintiff to Atlanta

79.     Because the County jail has no medical personnel and there delays were delays in providing care until an emergency arises, inadequate treatment was provided, resulting in infection and permanent injury.

80.     It was not until the new sheriff, Mr. Sim Davidson, released Plaintiff in March 2021, and Plaintiff then went to Dr. Hakky, his urologist in Atlanta, that he got treatment, and he has subsequently had seven or more operations, and will suffer high risk of infection the rest of his life, and loss of use of the previously corrected organ.

81.     Although at the outset, Mr. Davis informed the County Defendants he was prescribed various medications for serious conditions like COPD and pulmonary obstruction, he was not given any such medications, pursuant to County policy of not providing prescription medication, until after a three day breathing attack, Plaintiff was provided Albuterol on 12.14.2020, and Breo in January, 2021.

82.     As a result of the prolonged period where County Defendants did not provide Plaintiff prescribed breathing medications and Xanax to relax blood vessels to the lungs to help oxygen supply, Plaintiff's lungs are permanently injured and he is required to use oxygen.

83.     As a result of the prolonged period where County Defendants did not provide Plaintiff prescribed breathing medications Plaintiff suffered a prolonged period of feelings of suffocation and drowning, compounded by the pain and anxiety from the assault and the infected wound to the penis, compounded by his chronic anxiety for which he been prescribed medication which also was denied by the County Defendants, which have caused him to suffer PTSD and severe depression, all adversely impacting his ability to work as a freelance embalmer.

84.     Shortly after the October 21 attack, Dr. Peacock, who, before Plaintiff's detention treated Plaintiff for the peptic ulcer and bleeding, and who was informed of the injury to Plaintiff's

penis, and Dr. Hakky, began insisting agents of the Sheriff that Plaintiff be immediately taken to the specialist Dr. Hakky. which the Sheriff refused to do.

85.     But by late November, but eventually Dr. Peacock convinced the Sheriff that the Plaintiff needed to be examined by an emergency room physician, which if at a hospital covered by EMTALA, would be required by law, to transfer the Plaintiff to a hospital that could provide the necessary specialty treatment, which could include a transfer to Northside Hospital and Dr. Hakky. .

86.     On November 24, at the direction of the Defendant Sheriff Steverson, deputies Defendant Capt. Kyle Carver and Defendant Ofc. Eubanks took plaintiff to an EMTALA covered hospital defendant Dodge Cty. Hospital where Plaintiff was examined by Defendant Dr. Baruti.

87.     Within three days of the injury, puss and foul odors begin to emanate from the wounds to the penis, and by November 24 the conditions had worsened, and it was obvious Dr. Baruti that the wounds and infection to the even more complicated anatomy of the surgically altered and now wounded organ needed emergency medical care, or serious injury.

88.     Dr. Baruti took no action to gather cells or tissue, nor did any screening appropriate to the obvious symptoms associates with the infection and wounds to the penis, as it was obvious to Dr. Baruti, who is not a urologist, that neither he nor Defendant Dodge County Hospital had the adequate specialty training or facilities to stabilize the condition.

89.     With gross negligence, and not even the slightest care, Dr. Baruti, walked out of the room, turning Plaintiff's care back to the County jailers who brought him to the emergency room because of an emergency medical condition.

90.     Upon information and belief Defendant Southland had an obligation to Defendant Dodge County Hospital, of which Plaintiff and all patients coming to the Defendant Dodge Hospital ER

ER would be third party or intended beneficiaries, to be screened consistently with EMTALA and treated by persons qualified in emergency medical care, which includes the training to recognize when another specialist must be consulted for an appropriate screening and means of stabilization, and finally to transfer consistently with EMTALA where Dodge Hospital and Dr. Bruni would not have the capacity to screen or appropriately stabilize..

91.     Neither Defendant Southland, Defendant Dr. Baruti nor the Defendant Dodge Hospital could contract away protections under EMTALA for Plaintiff or others who sought treatment for emergency medical conditions at the Dodge Hospital.

92.     Even though Dr. Baruti Dr. Baruti had an obligation to arrange an EMTALA compliant transfer of Plaintiff to a hospital that could provide the appropriate care, it was clear that the jailers who had bought Plaintiff that he Defendants Capt. Kyle Carver and Defendant Ofc. Eubanks that Plaintiff needed a specialist and that Plaintiff's urologist in Atlanta could provide the care, and where jailers and the Sheriff had been informed by Dr. Peacock and Dr. Hakky that plaintiff had to be treated by Dr. Hakky or an equivalent  specialist, the Defendant Officers immediately said that the Sheriff made it clear that they would not be taking Plaintiff to Atlanta.

93.     When Dr. Peacock learned that plaintiff had not been transferred from the ER and Dodge Cty. Hospital to Atlanta, Dr. Peacock was infuriated and he called the Defendant Dodge County ER and informed them that it was Dr. Baruti's duty have Plaintiff transferred to the hospital in Atlanta.

94.     Plaintiff was taken back to the jail and not provided anything except hydrogen peroxide to apply himself, which apparently, according to later diagnosis and treatment by Dr.  Hakky, was driving the infection further internally and killing vessels and causing permanent damage, making repair impossible.

95.    Because by policy and custom Plaintiff still had not been provided any of his breathing medications, on December 11, 2020, Plaintiff had so much difficulty breathing, he laid down on the cell floor to stay cool, and help his breathing, and was seen by a jailer.

96.    The guard or another jailer called Capt. Carver, and he said he would get to it on Monday morning.

97.    Plaintiff felt like he was suffocating or drowning and he stayed on the floor so miserable he was hoping to die.

98.    On Monday Capt. Carver provided plaintiff with Albuterol on December 14, and then Breo in January, 2021.

99.    On December 30, 2020 Capt. Carver took Plaintiff to the Urgent Care, where Dr. Valerie Webb could only just observe the condition of plaintiff's penis because it was so infected and swollen.

100.    Plaintiff's penis was so swollen and infected that the doctor was afraid to touch it for fear that there would be a bloody and puss laced eruption from the infected site, and she would not be qualified to treat the condition in sufficient emergent time and her facility was without the equipment to properly treat such an emergency.

101.    Dr. Webb told Capt. Carver Plaintiff needed to go to Atlanta ASAP because it was an emergency and could not wait .

102.    Capt. Carver told Dr. Webb that they were not taking Plaintiff to Atlanta.

103.    On January 21 the new Sheriff took over the jail.

104.    However none of the policies that preexisted the new Sheriff with regard to provision of prescription medications of the timely provision of appropriate medical care changed in the indifference continued.

105.    Plaintiff continued to needlessly suffer and more permanent injury was caused to his external and internal organs.

106.    On February 24, 2021, Captain Donnie Stokes to plaintiff to a nearby Urologist, Dr. Edward Hays.

107.    Dr. Edward Hayes took one look at Plaintiff's condition and his job dropped, and he asked Plaintiff how long he had been in that condition and plaintiff told him since October 21.

108.    Dr. Hayes was in shock and couldn't believe it, and said that Plaintiff would have to have numerous surgeries to try and fix it, if it could be fixed, and Atlanta was the only place it could be done.

109.    Dr. Peacock and Dr. Hakky had been informing personnel at the jail that the only place that the surgery to be accomplished and that it needed to be accomplished immediately west in Atlanta.

110.    Dr. Webb had said the same thing back on December 30th.

111.    Had Dr. Baruti not abandoned Plaintiff and run away from the duties imposed upon the Defendant Hospital under EMTALA, he too would of said that numerous surgeries were required and he should have tried to find a place to provide the suitable stabilization and treatment, where plaintiff was suggesting that he could be Dr. Hakky, at Northside Hospital in Atlanta.

112.     But perhaps Dr. Baruti knew that that the County and the Sheriff would not make for arrangements to take plaintiff to be treated in Atlanta because they knew they would have to pay.

113.    Regardless under EMTALA, Dr. Baruti at a duly to appropriately screen and to stabilize and/or arrange transfer consistent with EMTALA.

114.    On March 4, 2021, Plaintiff was released from the jail.

115.    By inference Plaintiff was released because the Sheriff and/or agents of the County commission did not want to be responsible for the medical costs required to treat plaintiff, where under law they had a duty to pay for the treatment of plaintiff because the causation of the injury and need for medical care which the County is to provide occurred while he was under their custody.

116.    March 5 or 6th Plaintiff and his mother drove to Atlanta and Plaintiff was admitted to Northside in Atlanta, to begin treatment with Dr Hakky.

117.    Plaintiff was in the hospital for about six days, and given antibiotics intravenously IVs for the serious infections and remained on antibiotics for over a month after leaving the hospital.

118.    Since then Plaintiff has had an at least seven more operations on the penis and its internal components.

119.    Dr. Hakky indicates that Plaintiff will never be able to have an erection.

120.    Because the urethra was infected and the internal scar tissue continues to grow, he will be at a high risk of infection, and possible sepsis.

121.    On November 17, 2022, Plaintiff is scheduled to have an endoscopy for the peptic ulcer which he could not have because of the infections and other operations that were required first on the emergent basis

**Count 1. Policy and custom of the Sheriff's Department or refusal of individuals within the Sheriff's Department to provide, as required by state and federal law, bail hearing within 36 to 72 hours and probable cause hearing within 14 days of the September 18 arrest, where the assault occurred was October 21.**

122.    The Sheriff is sued individually and in his official capacity as are Chief Billy Johnson, Capt. Kyle Carver, Lt. Terry Moon, staff Sgt. Fussell, Sqt. Alisa Zanders and Ron Bowdoin, the officer who signed the warrant.

123.    O.C.G.A. § 17-4-21 places a duty on an arresting officer to take an arrested person before a judicial officer, and the statute instructs that the arresting officer shall take the arrested person before the most convenient and accessible judicial officer authorized to hear the case unless the arrested person requests otherwise . . ."

124.    More specifically, O.C.G.A. § 17-4-26 mandates that : "Every law enforcement officer arresting under a warrant shall exercise reasonable diligence in bringing the person arrested before the judicial officer authorized to examine, commit, or receive bail and in any event to present the person arrested before a committing judicial officer within 72 hours after arrest . The accused shall be notified as to when and where the commitment hearing is to be held . An arrested person who is not notified before the hearing of the time and place of the commitment hearing shall be released."

125.    The Georgia Supreme Court has held that § 17-4-26 requires the arresting officer to take the arrestee before a judicial officer within the prescribed time, or release the arrestee. *Watts v. Pitts*, 253 Ga . 501, 504 (1984). In addition to mandating the time frame during which to bring an individual before a judicial officer, the Georgia Assembly has codified the right of an individual to be committed to bail. O.C.G .A. § 17-6-1 . The statute specifically provides : "at no time,either

before a court of inquiry, when indicted or accused, after a motion for new trial is made, or while an appeal is pending, shall any person charged with a misdemeanor be refused bail." Id.

126.    Plaintiff was jailed September 18, 2020.

127.    Plaintiff was told by jailer during intake he would not get a bail or bond hearing.

128.    None of the Defendants who had a personal duty and the power to arrange a bail or bond arranged one for Plaintiff.

129.    That this lasted so long as to Plaintiff that it suggests a policy and custom of denying the required hearings.

130.    Other detainees complained of not getting these hearing.

131.    The absence of such a hearing in the public records, where the occurrence of such hearing require a record, will prove a policy.

132.    If a bail or probable cause hearing had been held, timely, Plaintiff would not have been assaulted, and suffered the resulting foreseeable consequences, of not receiving treatment according to the policy and practice of undue delay of treatment, in jail that never had medical any medically trained personnel tend to wounds or ensure delivery of prescribed medication.

133.    Plaintiff remained in jail until March 4, 2021 and never was provided the hearings. .

**Count 2. Clearly deficient policy by obvious absence of policy or training that detainees/inmates who pose a substantial risk of harm to others should be isolated and kept from others, including to detain or isolate from access to other detainees, any inmate or detainee who has just assaulted another.**

134.     The Sheriff is sued individually and in his official capacity as are Chief Billy Johnson, Capt. Kyle Carver, Lt. Terry Moon, Staff Sgt. Fussell, and Sqt. Alisa Zanders

135.    Plaintiff incorporates paragraphs 44-60.

**Count 3. Officers on duty indifferent to policy and training and obvious threat of imminent harm to others who failed and refused to isolate detainee or inmate Footman who had just assaulted another detainee, Lockette, where Footman otherwise presented a substantial risk of assault or disruption of causing fight, where isolating Footman would have prevented assault by Footman of Plaintiff Davis and challenged injuries to Plaintiff.**

136.     The following officers are sued individually Chief Billy Johnson, Capt. Kyle Carver, Lt. Terry Moon, Staff Sgt. Fussell, Sqt. Alisa Zanders, Clemmons, Toler, the Black woman guard in the Tower, and the other officers who may have been working that day, and possibly, Clements, Toby, Mcrae, Roundtree, Eubanks, Powell, Carter, Hulett, Johnson, Ocasio (deceased) McLoon Battle, Floyd.

137.     It is likely that any supervisor would have been told of the assault on Lockette by Footman.

138.     Two days before Footman had assaulted someone at lunch.

139.     Footman was very aggressive and threatening toward the officers.

140.     About an hour before Footman assaulted Plaintiff, Footman was up close and in Plaintiff's face telling Plaintiff and acting very erratic and threatening, and Clemmons and Tolerr and the guard in the tower should have seen this.

141.     Plaintiff incorporates 44-60. ____

142.     Inmate witness: Steven May, Allan Hebert,

**Count 4. Officers present failed to timely intervene in the assault by Footman of Plaintiff, that caused the severe injury, even though the officers had an opportunity to do so.**

143.    The following officers are sued individually Chief Billy Johnson, Capt. Kyle Carver, Lt. Terry Moon, Staff Sgt. Fussell, Sqt. Alisa Zanders, Clemmons, Toler, the Black woman guard in the Tower, and the other officers who may have been working that day, and possibly, Clements, Toby, Mcrae, Roundtree, Eubanks, Powell, Carter, Hulett, Johnson, Ocasio (deceased) McLoon Battle, Floyd.

144.    Plaintiff incorporates 44-60.

145.    Inmate witness: Steven May, Allan Hebert,

**Count 5. Policy, practice and custom of no professional or licensed qualified medical care funded or provided by Defendants County Commissioners and/or Sheriff, and routine, prolonged failure to provide meaningful and timely medical care by outside sources, including as to Plaintiff's infected wound from the assault by Footman on October 21, 2020.**

146.    Plaintiff sues the County and the County Commissioners for a history of funding that is deliberately indifferent to obvious medical needs and the duty of the County to provide and fund medical care.

147.    Plaintiff sues Sheriff Steverson in his individual and official capacity for medical care that was deliberately indifferent for the entire period of his incarceration. ,

148.    The following officers are sued individually Chief Billy Johnson, Capt. Kyle Carver, Lt. Terry Moon for not requiring that Plaintiff be treated by outside providers.

149.    Plaintiff incorporates31-43 and 61-115.

150.    This policy and practice resulted in substantial periods of time during

which the inmates were at the mercy of medically-untrained personnel who were
entrusted by Jail officials to make medical decisions.

151.    The policy dangerously and obviously posed the risk that necessary inmate medical care
would be delayed or denied and, in fact, caused the delay in providing the Plaintiff emergency
medical attention

152.    In sum, Telfair County, as a result of lack of funding by Defendant County Commission
members individually and in their official capacities, or the deliberate indifference of the Sheriff
to the substantial likely medical needs of detainees and inmates, or deliberate indifference by the
Sheriff, did not have a written policy for the provision of medical care to inmates, it adopted a
grossly inadequate unwritten policy, and in the alternative, if it did have a written policy about
the provision of medical care, it was neither followed nor enforced, as to all times material
herein, from September 2020 through March 4, 2021

153.    No medically-trained person or staff member conducted any training of jail
guards to ensure inmates would receive essential medical care.

154.    Together, these policies were clearly the moving force behind the deprivations suffered
by the Plaintiff

**Count 6.  Policy and custom of the Defendants County Commissioners of not funding or
refusing to provide funding for, and of the Sheriff of not providing medication prescribed
or ordered by physicians, or that would have been ordered by a physician**.

155.    The County is sued and the Commissioners in their individual capacities are sued for
failure to provide funding to provide prescribed medication.

156.    The Sheriff's sued individually and in his official capacity for not using the funds
provided to provide prescribed medication.

157.    Plaintiff incorporates 31-43 and 94-98.

**Count 7.   Policy and custom of the Defendants County Commissioners of not funding or refusing to provide funding for, and of the Sheriff of not following advice and orders by physicians for ongoing serious medical conditions, in the face of obvious substantial risk of serious harm of not complying with a doctor's orders.**

158.    The County is sued and the Commissioners in their individual capacities are sued for failure to provide funding to provide treatment prescribed by physicians.

159.    The Sheriff's sued individually and in his official capacity for not using the funds provided to provide prescribed medication.

160.    Plaintiff incorporates 99-110.

**Count 8. Dodge County Hospital failed to provide an appropriate screening, stabilize plaintiff, or provide the required transfer consistent with plaintiff's emergency medical condition as required by EMTALA.**

161.    Dodge Cty. Hospital is covered by EMTALA is sued thereunder for failure to provide an appropriate screening, stabilize plaintiff, or provide the required transfer consistent with plaintiff's emergency medical condition under EMTALA.

162.    Plaintiff incorporates paragraphs 25-30, 85-94, and 111-113.

163.    The violation of EMTALA caused continuing injury to Plaintiff.

**Count 9. Dr. Baruti did not provide the slightest care and acted with gross negligence causing continued injury to Plaintiff.**

164.    Plaintiff incorporates paragraphs 28-30, 85-94, and 111-113.

165.    Dr. Baruti caused continuing injury to Plaintiff.

**Count 10. Southland filed to provide a physician qualified in emergency care who knew how to apply his license consistent with EMTLA causing a breach of the contract with Dodge Hospital, and injuring the third party or intended beneficiary, Plaintiff.**

166.    Southland is sued for breach and the injury caused to Plaintiff.

167.    Plaintiff incorporates paragraphs 27-30, 85-94, and 111-113.

**Count 10. The County failed to pay for Plaintiff medical care, for the injuries occurring while Plaintiff was under arrest and for the injuries caused by lack of treatment, fore which Plaintiff or a third party provider has to pay for treatment after March 4, 2021.**

168.    The Defendant County owes for all medical care provided after Plaintiff's release because the need for treatment was caused while Plaintiff was in the Telfair County jail and state law requires the County to pay.

WHEREFORE, Plaintiff prays judgment against one or more Defendants, individually or jointly for the following:

a.    Compensatory damages as allowed by law;

b.    Special damages, as more particularly shown at trial;

c.    Damages for injuries caused by deprivation of Constitutional rights under the United States Constitution;

d.    Punitive damages against each individual Defendant in their individual capacity;

e.    Reasonable attorney fees, costs and expenses of litigation under 42 U.S.C. § 1988;

f.     Any other and further relief so ordered.

        A JURY TRIAL IS HEREBY REQUESTED.

        This 21st day of October, 2022.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
Attorney for Plaintiff
P.O. Box 3248
Augusta, GA 30914
706-737-4040
FAX 706-7363391
jpbatson@aol.com

Prepared by:

John P. Batson
P.O. Box 3248
Augusta, GA 30914
706-737-4040